OPINION OF THE COURT
Robert A. Onofry, J.
This petition, filed by petitioner Orange County Legislature, pursuant to article 78 of the CPLR, seeks a judgment: (1) declaring respondent County Executive’s unilateral action in declaring the 2013 operating budget adopted by petitioner Orange County Legislature on December 12, 2012, as null and void, in excess of the County Executive’s authority and jurisdiction, and otherwise arbitrary, capricious and an abuse of his discretion; (2) declaring the revised budget as adopted by Orange County Legislature on December 12, 2012, over the respondent County Executive’s veto, as being the duly adopted 2013 operating budget for Orange County for budget year 2013; (3) enjoining the respondent County Executive in the nature of mandamus to follow and properly implement said operating budget in accordance with the Orange County Charter and further directing the respondent Budget Director to certify and file said adopted 2013 operating budget in accordance with the State Finance Law; and (4) enjoining respondent County Executive, and those under his direction and control, from closing the Valley View Nursing Home during fiscal year 2013 and requiring respondent County Executive to withdraw his closure plan for Valley View Center for Nursing Care and Rehabilitation from consideration by the New York State Department of Health; and upon this cross motion by respondents, County Executive Diana and Budget Director Blair, pursuant to CPLR 2215, 3001, 3212 and 6314, for a judgment: (1) vacating the preliminary injunction heretofore issued on February 6, 2013; (2) for summary judgment in favor of respondents on their declaratory judgment action; (3) dismissal of the petition, or, alternatively, (4) directing that an evidentiary hearing be conducted, on an expedited basis, if the court concludes that such hearing is warranted; and (5) for such other *280 and further relief as to the court may seem just, equitable and proper:
It is ordered, that the petition of the Orange County Legislature, insofar as it seeks, inter alia, article 78 relief in the nature of mandamus, is granted to the extent hereinafter set forth; and it is further ordered, that consistent with the foregoing, respondents’ cross motion, which seeks summary judgment, pursuant to CPLR 3212, and a dismissal of the petition, is denied and the answer is dismissed; and it is further ordered, that consistent with the foregoing, the court, sua sponte, grants to petitioner summary judgment; and it is further ordered, that consistent with the foregoing, and to the extent that petitioner and respondents seek a declaration, pursuant to CPLR 3001, of their respective rights and legal relations, such declaratory relief is granted to the extent set forth herein; and it is further ordered, that consistent with the foregoing, and to the extent petitioner seeks injunctive relief, pursuant to article 63 of the CPLR, such injunctive relief is granted to the extent set forth herein.
Introduction
Petitioner, Orange County Legislature, commenced this proceeding, pursuant to article 78 of the CPLR. It is a proceeding which emanates from an interbranch dispute between Edward Diana, Orange County Executive, and the Orange County Legislature over the adoption and implementation of the 2013 Orange County budget, and in which each side seeks, inter alia, various modes of injunctive and declaratory relief.
At issue, and the catalyst for the dispute, is whether the Valley View Center for Nursing Care and Rehabilitation (Valley View), the County’s sole nursing home/residential care facility, will continue to remain open and operational for budget year 2013 (a priority established by the Orange County Legislature) or whether the County Executive possesses the inherent statutory power, under the Orange County Charter (the Charter), to unilaterally close the facility for budgetary reasons without the Legislature’s approval. It is a dispute presented in the context of the adoption of the 2013 budget itself; the procedural validity and legitimacy of which requires this court’s examination of the power and authority reposed in the executive and legislative branches by the Charter, the Charter’s inherent system of checks and balances, the validity of the legislative amendments purportedly adopted to the County Executive’s proposed budget, *281 including the extent to which, if at all, such amendments remained within the confines of the state’s 2% tax cap, the County Executive’s veto of those amendments, the Legislature’s override of that veto and the County Executive’s declaration of the same as “null and void” and “unlawful.”
Orange County operates under a charter form of government, the underpinnings of which are derived from state constitutional and legislative authority.[1] The Charter also outlines the procedure for the adoption of the county budget; a procedure which contemplates the submission of a proposed budget to the Orange County Legislature by the County Executive, the Legislature’s subsequent examination of, and where applicable amendment to, the proposed budget, the acceptance and/or veto of the Legislature’s changes by the County Executive, and the Legislature’s acquiescence to, or override of, such veto. Superimposed upon the county budgetary process is the neces *282 sity for compliance with General Municipal Law § 3-c[2] which imposes upon the County (indeed virtually all municipalities with the exception of the City of New York and the counties within its boundaries) a 2% cap on the real property tax levy, absent the adoption of a local law authorizing a levy in excess of the cap.
The County Executive argues that the budgetary amendments effectuated by the Legislature were defective in two respects: (1) that the Legislature’s November 14, 2012 resolution (Resolution No. 272 of 2012) increased the 2013 tax levy over the 2% tax cap and by doing so it was required to (but failed to) pass a corresponding local law, by at least 60% of those entitled to vote thereon, as required by General Municipal Law § 3-c; and (2) that the Legislature’s subsequent override of his veto on December 12, 2012 was procedurally defective in that it amended, and in effect ratified, the Legislature’s resolution of November 14, 2012, Resolution No. 272, which impermissibly exceeded the tax cap but included a different levy amount.
The County Executive further argues, inter alia, that he possesses the inherent power and authority to close Valley View; power and authority derived from the express grant of authority conferred upon him by the County Charter, and necessarily implied from the Charter and state law. This power and authority, he asserts, is superior to, and exists independently of, the Legislature’s power derived from its adoption of a budget resolution purporting to fund Valley View for an entire year.
In opposition, the County Legislature argues that the County Executive has misconstrued and misinterpreted its budget resolution of November 14, 2012 (Resolution No. 272), a resolution, it asserts, which neither increases nor decreases the County Executive’s proposed tax levy, which itself was under the tax *283 cap. In sum, the Legislature argues that the clear intent of the same was that the County Executive’s tax levy, as it applied to Valley View, was neither increased nor decreased, but merely reallocated. Thus, since the tax levy was under the 2% tax cap, no local law was required. Correspondingly, it argues that its veto override vote of December 12, 2012 (Resolution No. 328), and its adoption of the 2013 budget (Resolution No. 331) as amended by Resolution No. 338, was proper since Resolution No. 272 never changed the magnitude of the County Executive’s initial tax levy proposal.
The Legislature further argues that the County Executive’s proposed closure of Valley View is tantamount to the elimination and/or abolishment of a department; power and authority, it asserts, only the Legislature has under the Charter. The Legislature therefore seeks, inter alia, article 78 relief in the nature of mandamus compelling the County Executive to implement the Legislature’s 2013 budget, and injunctive relief enjoining, prohibiting and restraining the County Executive from closing Valley View.
The petition is granted and the petitioner is awarded such article 78 injunctive and declaratory relief to the extent set forth herein. Consistent with the foregoing, the respondents’ cross motion is correspondingly denied and the answer dismissed.
Factual Background/Procedural History
The Orange County Charter is the operative document for the County and sets forth the “form of government for the County of Orange.” It is a document which provides, among its various stated purposes, for the “separation of county executive and legislative functions.” (Charter § 1.01.)
Pursuant to article I of the Charter, the County Executive’s functions, duties and powers are enumerated in article III (§ 1.05 [h]) and the functions, powers and duties of the County Legislature are enumerated in article II of the Charter (§ 1.05 [i]).
Article II (§ 2.02), in relevant part, provides that “[t]he County Legislature shall be the legislative, appropriating and policy determining body of the County . . . [and shall possess] all the legislative powers and duties . . . conferred [upon it] together with all the powers and duties necessarily implied or incidental thereto.” Section 2.02 further provides that, in addition to all powers conferred by the foregoing provisions, or any *284 other provision of the Charter, the County Legislature is vested with the following enumerated powers:
“(b) to make appropriations, incur indebtedness and adopt the budget. . .
“(c) to levy taxes . . .
“(f) by local law to create, alter, combine or abolish County administrative units not headed by elective officers; [and]
“(1) establish or abolish positions of employment and titles thereof.” (Emphasis supplied.)
Article III, § 3.02, defines the powers and duties of the executive branch and, in relevant part, provides that
“[t]he County Executive shall be the chief executive officer of the County[,] except as may otherwise be provided in this Charter or the Administrative Code, [and] shall have and exercise all the executive and administrative powers and duties now or [thereafter] conferred or imposed upon him by [the] Charter or the Administrative Code ... or the executive branch of the County by State law, together with all the powers and duties necessarily implied or incidental thereto.”
Among such powers, and those specifically conferred upon him, include that he shall:
“(b) be the Chief Budget Officer of the County and present to the County Legislature the Annual Budget . . . and, at the close of each fiscal year or as soon thereafter as practicable, a report of the financial and other transactions of the County including the reports of the several departments of the County government; . . .
“(e) supervise, direct and control and administer all departments-, . . .
“(h) supervise and direct the internal structure and organization of every unit of the executive branch of the County government, including, except as may otherwise be provided in this Charter, the Administrative Code or applicable law, the appointment and dismissal of employees; . . .
“(q) declare the existence of emergencies affecting the life, health or safety of inhabitants of the County and . . . exercise all the powers and duties necessary for the protection thereof;
“(r) make such recommendations to the County *285 Legislature with respect to the affairs of the County and its government as he may deem appropriate; [and]
“(s) except as may otherwise be provided in this Charter or the Administrative Code, have all the powers and perform all the duties . . . conferred or imposed upon him by local law.” (Emphasis supplied.)
In addition to the aforementioned powers, duties and functions, and pursuant to section 4.04 of the Charter, the County Executive is required, inter alia, to submit to the County Legislature, on or before October 1st of each year, his proposed budget for the ensuing fiscal year and an accompanying budget message. The budget message must consist of, inter alia, an outline of existing and proposed financial policies as they relate to the main features of the budget and a simple, clear, general summary of the contents of the budget. (Charter §§ 4.04 [b]; 4.05 [a].) The Clerk of the Orange County Legislature is thereafter required to schedule a public hearing on the proposed budget (Charter § 4.06) after which the action of the Legislature ensues.
Pursuant to Charter § 4.07, after the public hearing, the County Legislature may adopt the budget with or without amendment.
“In amending it may strike out, increase, add to or reduce any item of appropriation or add a new item of appropriation in the proposed County budget except for appropriations for debt service and any other appropriations required by law and shall submit any such changes to the County Executive no later than the fifteenth day of November.” (Charter § 4.07 [a].)
Section 4.07 (a) further contemplates the County Executive’s review of any legislative changes to his proposed budget by providing that
“[t]he County Executive may veto any such striking out, reduction, addition or increase and give notice thereof to the County Legislature not later than the first day of December, and no such striking out, reduction, addition or increase shall be passed over his veto by less than a two-thirds vote. The budget shall [thereafter] be adopted not later than the fifteenth day of December.” (Emphasis supplied.)
In conformity with his statutory obligations under section 4.04 (b), and on or about September 28, 2012, County Executive *286 Diana submitted his proposed budget for fiscal year 2013 to the County Legislature for its consideration; a proposed gross county budget totaling $715,920,032. Compared to the 2012 budget of $712,932,667, the 2013 budget proposal represented an increase of only ,4%.[3]
Thereafter, and pursuant to the Legislature’s resolution adopted on October 4, 2012 (Resolution No. 234 of 2012), a public hearing on the proposed budget was established for October 24, 2012. Subsequent to the public hearing, and on November 14, 2012, the Orange County Legislature adopted certain budgetary changes to the County Executive’s proposed 2013 budget (Resolution No. 272 of 2012); legislative changes and amendments communicated to the County Executive by letter dated November 15, 2012 authored by Orange County Legislature Clerk Ramppen.[4]
*287 In response to Legislature Clerk Ramppen’s transmittal of the Legislature’s resolution of November 14th, and on November 23, 2012, Budget Director Blair thereupon notified Chairman Pillmeier that the Orange County Legislature had, in adopting its November 14th resolution, increased the 2013 tax levy over the 2% tax cap enacted by New York State under chapter 97 of the Laws of 2011, further noting that the amount in excess was $5,433,859. Budget Director Blair further informed Chairman Pillmeier that, by reason of the foregoing, “the Legislature must pass a local law overriding the 2% cap [and] [t]he local law must be passed by sixty percent of the total voting power of the Legislature.”
Budget Director Blair’s memorandum of November 23, 2012 was thereafter followed by County Executive Diana’s veto letter of November 30, 2012; a budget veto, he asserted, he was “compelled” to effectuate arising from his “fiduciary duty as Chief Executive Officer and Chief Budget Officer of the County” and a veto he was exercising pursuant to his authority under section 4.07 (a) of the Charter.
The basis for the executive veto, as articulated in the County Executive’s letter of November 30, 2012, was twofold: (1) that the resolution (Resolution No. 272) imposed an increase of 14.13% to the County’s tax rate and an increase of 8.55% to the county tax levy; and (2) that the resolution (Resolution No. 272) hinged upon “hypothetical, unrealistic and speculative revenue sources and questionable expense reductions . . . [which were] . . . inconsistent with sound accounting principles and accepted accounting and budgetary standards.”[5]
Thereafter, and on December 12, 2012, the Orange County Legislature again convened for the purpose of addressing, inter *288 alia, the override of the County Executive’s veto. After extended discussion, and by Resolution No. 328 of 2012, the Orange County Legislature, by a vote of 19 to 2, voted to override County Executive Diana’s veto of November 30, 2012, and in so doing made specific reference to its November 14, 2012 amendments to the Executive’s budget, specifically referencing Resolution No. 272 of 2012. Immediately thereafter, and on December 12, 2012, the Orange County Legislature duly adopted a resolution providing for the raising of taxes for the general budget (Resolution No. 331 of 2012). Subsequent thereto and on December 14, 2012, the Legislature adopted a resolution amending Resolution No. 331 of 2012 (Resolution No. 338 of 2012) in order to correct a clerical error contained in Resolution No. 331 which related to the stated amount of total taxes to be raised for general county purposes.
Lastly, and by letter dated December 18, 2012, and in response to the aforementioned Orange County Legislature resolutions, County Executive Diana rejected the same as “unlawful” asserting, inter alia, that Resolution Nos. 331 and 338 were “null and void.” In so declaring the resolutions to be a nullity, the County Executive asserted that when the Legislature voted to override his veto it did so making “new additional changes” and “had no legal authority to make fresh modifications to his executive budget that were not made when it adopted its revisions in Resolution 272 of 2012.” In concluding his veto message, the County Executive noted that he was “unable to enforceor implement a legislative enactment made in derogation of the law.”
The record further reveals that, against the backdrop of the 2013 county budget adoption process, the New York Department of Health (DOH) was in the process of reviewing a closure plan (the plan) for Valley View; a closure plan, which the record *289 suggests, was originally filed by the County Executive in October of 2012, at or about the time of the County Executive’s 2013 budget submission. The record further suggests that the plan was filed without the prior authorization, or knowledge, of the Legislature.
Ultimately, the plan was approved on January 28, 2013; an approval memorialized by DOH Deputy Commissioner Westerfelt’s letter of January 28, 2013 addressed to Valley View Administrator Lawrence LaDue. In approving the plan, DOH Deputy Commissioner Westerfelt noted that the New York State Department of Health had completed its review of the comprehensive closure plan submitted for the Valley View Center for Nursing Care and Rehabilitation and, as a result of such review, was certifying that the plan, as submitted, satisfactorily met the criteria established by the Department. The Deputy Commissioner further stated that “it [the plan] assures that appropriate care will be provided to residents throughout the closure process and ensures appropriate transfer of residents.” In concluding, Deputy Commissioner Westerfelt also advised La-Due that at the time the facility was no longer operational and occupied by any residents, it was incumbent upon the County (and the County was so instructed) to “relinquish [its] operating certificate to the Department.”[6]
*290 The closure of Valley View, as it relates to powers exercisable by the executive and legislative branches, is significant from an internal county structural standpoint as well. Article XXIII of the Charter provides for the creation of a Department of Residential Health Care Services, a department which is to be headed by a commissioner, who in turn is appointed by the County Executive, subject to confirmation of such appointment by the County Legislature (§ 23.01). The commissioner’s sole function is to “manage and supervise the Residential Health Care institutions of the County.” (§ 23.02 [a].) Valley View is the only residential health care institution owned and operated by the County.
Thus, it is on these facts and these arguments that petitioner Orange County Legislature seeks article 78 relief in the nature of mandamus, as well as declaratory and injunctive relief, declaring, inter alia, that the 2013 Orange County budget, as adopted by the Legislature, be declared the valid and enforceable Orange County budget for 2013, directing that the County Executive implement the same, that the County Executive’s declaration of December 18, 2012, declaring the Legislature’s action a “nullity,” itself, be declared a nullity, and that the County Executive be enjoined from closing Valley View during 2013, and upon which respondents (the County Executive and the Budget Director of Orange County) seek, inter alia, a vacatur of the preliminary junction issued on February 6, 2013,[7] a grant of summary judgment on their cross motion, a dismissal of the Legislature’s *291 petition, and a declaration that the County Executive possesses, and is vested with, the inherent power to close Valley View notwithstanding the Legislature’s purported funding for the same for 2013.
Discussion/Legal Analysis
The parties, in seeking various forms of article 78, injunctive and declaratory relief, have presented to the court multiple issues; issues which include, inter alia, whether the Orange County Legislature, pursuant to the terms of the Charter, properly amended the County Executive’s proposed budget, whether such amendments exceeded the tax cap, whether the Legislature’s veto override vote was proper and binding upon the County Executive, the County Executive’s authority to declare such override a nullity and whether the County Executive is vested with the requisite power and authority, pursuant to the Charter, to unilaterally close the Valley View without the Legislature’s approval; issues which the court will address in seriatim.
Summary Judgment and Injunctive Relief Standards
As a preliminary matter, although only the respondents have cross-moved for summary judgment, under CPLR 3212, it is clear, based upon the detailed submissions filed by each, that both parties have charted a course for summary judgment. It is equally clear that disposition of the issues presented is, in large part, dependent upon the interpretation of the Charter itself and the amendments to the budget adopted by the Legislature, which likewise lend themselves to such summary disposition.
*292 Thus, in addressing the respective motions, the court begins with the well settled principle that a grant of summary judgment is appropriate only where the court determines, after a “search of the record” that there are no material issues of fact. Issue identification, not issue determination is controlling. It is therefore incumbent upon the moving party to make a prima facie showing of entitlement to judgment, as a matter of law, tendering sufficient evidence to eliminate any material issues from the case. Failure to do so requires denial of the motion, regardless of the sufficiency of the opposing papers. (See Winegrad, v New York Univ. Med. Ctr., 64 NY2d 851 [1985]; Zuckerman v City of New York, 49 NY2d 557 [1980]; City of New York v Grosfeld Realty Co., 173 AD2d 436 [2d Dept 1991].) Here, respondents failed to establish, prima facie, their entitlement to judgment, as matter of law, to either dismissal of the pending proceeding or the declaratory relief which they seek.
CPLR 3212 (b) nevertheless provides, in relevant part, that “[i]f it shall appear that any party other than the moving party is entitled to a summary judgment, the court may grant such judgment without the necessity of a cross-motion.” Thus, since the parties have laid bare their proof, and although not formally moving for such, the court nevertheless concludes, and so finds, that petitioner is entitled to summary judgment on the article 78, injunctive and declaratory relief which it seeks, insofar as hereinafter set forth and for the reasons enumerated. Similarly, respondents have failed to raise a triable issue of fact which would warrant the denial of the relief which petitioner seeks. (Alvarez v Prospect Hosp., 68 NY2d 320 [1986].)
In so concluding, the court next turns to the injunctive relief which petitioner seeks. In order to be entitled injunctive relief under article 63 of the CPLR, it is incumbent upon the petitioners to establish, by clear showing, three essential elements: (1) the likelihood of ultimate success on the merits; (2) that irreparable harm will be suffered by the parties or the public absent the granting of such injunctive relief; and (3) a balancing of the equities in favor of the injunction. (Aetna Ins. Co. v Capasso, 75 NY2d 860 [1990]; W.T. Grant Co. v Srogi, 52 NY2d 496 [1981]; Trump on the Ocean, LLC v Ash, 81 AD3d 713 [2d Dept 2011]; Apa Sec., Inc. v Apa, 37 AD3d 502 [2d Dept 2007].)
Here, insofar as ordered and for the reasons hereinafter set forth, petitioner has established, prima facie, its entitlement to the equitable relief which it seeks. Petitioner, through its submissions, has established not only a substantial likelihood of success on the merits, but ultimate success. Further, a finding *293 that the County Executive’s actions, or threatened actions, are ultra vires and a violation of the doctrine of separation of powers, provides sufficient predicate for a finding of irreparable harm. Lastly, in view of the foregoing, a balancing of the equities tips decidedly in favor of the petitioner. Moreover, one only has to look at the County Executive’s budget proposal, and the executive summary contained therein, as it applies to Valley View, to appreciate the magnitude, and the consequences, of what he proposes to implement, in unilateral fashion, if unchecked.
The Declaratory Relief Sought by the County Executive and the Legislature — The Standard
In its cross motion, respondent County Executive seeks, inter alia, a judicial declaration that legitimizes (vis-á-vis his powers emanating from the Charter) his unilateral right to close the Valley View Nursing Home, notwithstanding the Legislature’s purported funding for the same for the entire year. In opposition and in its underlying petition, the County Legislature seeks, in the form of article 78 relief, to enjoin the County Executive from the same and further seeks, in the nature mandamus, a direction that he be compelled to implement the 2013 county budget in accordance with its budget override vote of December 12, 2012 (Resolution No. 328), and budget Resolution No. 331, as amended by Resolution No. 338 adopted on December 14, 2012. Therefore, and by implication, the Orange County Legislature also seeks declaratory relief as to its right of preeminence in this area as the policy making and appropriating body of county government. It further asserts its preeminence on an issue of this magnitude, i.e., the closing of Valley View, its only long-term care facility for the elderly and infirm, which it argues is tantamount to abolishing a department or administrative unit, which only it can authorize.
As a preliminary matter, courts are prohibited from rendering advisory opinions. (Church of St. Paul & St. Andrew v Barwick, 67 NY2d 510 [1986]; Community Hous. Improvement Program v New York State Div. of Hous. & Community Renewal, 175 AD2d 905 [2d Dept 1991].) Declaratory relief is warranted, and available, only where the controversy between the parties is justiciable. The underlying statutory basis for declaratory relief is derived from CPLR 3001, which provides, in relevant part, that “[t]he supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal *294 relations of the parties to a justiciable controversy whether or not further relief is or could be maintained claimed.”
An action for a declaratory judgment is one that seeks to have the court establish and promulgate the rights of the parties on a particular subject matter. It is remedial in nature and its primary purpose is to stabilize the legal relations that exist between the parties and to eliminate uncertainty as to the scope and content of both present and prospective legal obligations (see Goodman v Reisch, 220 AD2d 383 [2d Dept 1995]; Chanos v MADAC, LLC, 74 AD3d 1007 [2d Dept 2010]); the prerequisites for which are the existence of an actual controversy, a controversy that is justiciable, and a controversy where a legally protectible interest is determined to be present and where such interest is directly in issue. (Long Is. Light. Co. v Allianz Underwriters Ins. Co., 35 AD3d 253 [1st Dept 2006]; Matter of Enlarged City School Dist. of Middletown v City of Middletown, 96 AD3d 840 [2d Dept 2012]; Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo, 64 NY2d 233, [1984]; New York Pub. Interest Research Group v Carey, 42 NY2d 527 [1977].)
A declaratory judgment requires an actual controversy between genuine disputants with a stake in the outcome. The dispute must have a direct and immediate effect upon the rights of the parties and must be real, definite, substantial and sufficiently matured; it cannot be hypothetical, contingent or advisory in nature. (Ashley Bldrs. Corp. v Town of Brookhaven, 39 AD3d 442 [2d Dept 2007]; Long Is. Light. Co. v Allianz Underwriters Ins. Co.; Enlarged City School Dist. of Middletown v City of Middletown; DiCanio v Incorporated Vil. of Nissequogue, 189 AD2d 223 [2d Dept 1993]; Self-Insurer’s Assn. v State Indus. Commn., 224 NY 13 [1918, Cardozo, J.]; Church of St. Paul & St. Andrew v Barwick, 67 NY2d 510 [1986]; Community Hous. Improvement Program v New York State Div. of Hous. & Community Renewal, 175 AD2d 905 [2d Dept 1991].)
Here, all the required prerequisites have been met and declaratory relief, as to each, is appropriate.
The County Executive’s Veto of the 2013 Legislative Budget and the Legislature’s Override
The Legislature seeks by a writ of mandamus, pursuant to article 78 of the CPLR, to compel the County Executive to follow and properly implement the Orange County 2013 operating *295 budget which it asserts was properly adopted. The relief is warranted.
Article 78 relief in the form of mandamus may only be granted where a petitioner establishes a “clear legal right” to the relief requested. (Matter of Council of City of N.Y. v Bloomberg, 6 NY3d 380, 388 [2006]; Matter of Brusco v Braun, 84 NY2d 674 [1994]; Matter of National Equip. Corp. v Ruiz, 19 AD3d 5 [1st Dept 2005].) It is never granted, however, for the purpose of compelling an illegal act. (Matter of Council of City of N.Y. v Bloomberg; Matter of Carow v Board of Educ. of City of N.Y., 272 NY 341 [1936].) Moreover, an article 78 proceeding seeking mandamus to compel the performance of a specific duty applies only to acts that are ministerial in nature and not those which involve the exercise of judgment or discretion. (Matter of Maron v Silver, 14 NY3d 230 [2010]; Klostermann v Cuomo, 61 NY2d 525 [1984]; Matter of Gimprich v Board of Educ. of City of N.Y., 306 NY 401 [1954]; Matter of Crain Communications v Hughes, 74 NY2d 626 [1989].)
At the heart of the interbranch dispute between the County Executive and the Orange County Legislature, and the validity of the County Executive’s veto and the Legislature’s override of the same, lies the meaning and interpretation of Charter § 4.07 (a), and the validity of the manner in which, and the magnitude of, the budgetary amendments codified by the Legislature in its resolution of November 14, 2012 (Resolution No. 272), which amended the County Executive’s initial proposed tax appropriation for Valley View.
Here, the court concludes, and so finds, that the budget amendments effectuated by the Legislature, and as codified in Resolution No. 272, were done so in conformity with, and in the manner prescribed by, section 4.07 (a), that the amendments so effectuated were under the 2% statutory tax cap obviating the necessity for the adoption of a companion local law, and that the clear intent, as manifested by the manner in which those amendments were effectuated by the Legislature in the schedule denoted as “Legislative Adjustments Schedule B” attached to Resolution No. 272, was to retain the aggregate tax levy figure as originally proposed by the County Executive and to incorporate the same in its revenue projections for Valley View’s funding for an entire year. Correspondingly, and based upon the foregoing, the court further concludes, and so finds, that the Legislature’s override vote, by a supermajority of 19 to 2, on December 12, 2012 (Resolution No. 328) was valid and binding *296 upon the County Executive, that the County Executive’s subsequent declaration of December 18, 2012, declaring the same a nullity, is, and was, itself a nullity and in excess of the County Executive’s powers conferred upon him under the County Charter, that the 2013 county budget, as amended by the Orange County Legislature, was properly adopted, and that such budget is enforceable by the Legislature, and binding upon the County Executive, in accordance with its terms.
The County Executive is therefore duty bound to follow and properly implement such budget within the confines of the powers conferred upon him by the Charter.
In so concluding, the court begins its analysis with the well settled and general interpretative principle that documents are to be construed in accordance with the intent of the parties and the best evidence of that intent is what the parties express in their writing. (Goldman v White Plains Ctr. for Nursing Care, LLC, 11 NY3d 173 [2008]; Innophos, Inc. v Rhodia, S.A., 10 NY3d 25 [2008].) A companion interpretative principle is that the language so utilized is to be accorded its plain and natural meaning, unless a different or specific meaning is intended. (Greenfield v Philles Records, 98 NY2d 562 [2002]; Goldman v White Plains Ctr. for Nursing Care, LLC; Innophos v Rhodia, S.A.) Moreover, matters of interpretation, including the determination of whether an ambiguity exists, is a question of law for the court. (Bailey v Fish & Neave, 8 NY3d 523 [2007]; R/S Assoc. v New York Job Dev. Auth., 98 NY2d 29 [2002]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157 [1990].)
Here, the court concludes, and so finds, that the document attached to Resolution No. 272, denoted as “Legislative Adjustments Schedule B,” is clear and unambiguous and is enforceable by the Legislature, and binding upon the County Executive, in accordance with its terms. Further the court concludes, and so finds, that the clear intent of the legislative adjustments was to adopt the County Executive’s tax levy figure of $7,509,722, as presented (in the context of a one-month appropriation), reallocate (not increase) the same for the purpose of generating IGT revenue, and fund Valley View for an entire year.
In opposing the Legislature’s application, respondents’ arguments appear to be threefold: (1) the Legislature, in effectuating its adjustments, actually added an additional $4,309,722 to the tax levy originally proposed by the County Executive thereby exceeding the 2% tax cap without the adoption of a corresponding local law; (2) one and only one methodology may be used in *297 effectuating those legislative amendments; and (3) the Legislature’s intent in effectuating those amendments is irrelevant. The court disagrees.
First, intent is relevant in ascertaining what changes, if any, were effectuated. And while it is true, as the County Attorney asserts, and correctly so, that it was difficult, if not impossible, at times to discern, from their debate and the legislative minutes, what the Legislature intended, that intent nevertheless coalesced into the budget resolutions at issue; resolutions which in their simplicity (at least as to the magnitude of the tax levy itself) were clear and unambiguous. Morever, that is how our system of democracy works, at least within the confines of the legislative branch. Second, a review of the legislative adjustments schedule as a whole, including the two tax levy entries under the same budget code, reveal that the Legislature, in the context of revamping Valley View’s funding for the entire year, utilized the same tax levy appropriation presented in the County Executive’s budget ($4,309,722 + $3,200,000), i.e., $7,509,722. Third, to the extent the executive branch asserts the Legislature utilized an impermissible methodology in amending his tax levy appropriation, the suggested methodology for amendment is permissive not mandatory. Article IV when interpreted as a whole, is replete with clear distinctions between what is considered mandatory (“shall”) and what is considered permissive or discretionary (“may”). The word “may” is prima facie permissive and implies discretion unless the clear legislative intent of the statute or public policy requires that it be construed as mandatory (McKinney’s Cons Laws of NY, Book 1, Statutes § 171; see also Town of Hempstead v Lawrence, 138 App Div 473 [2d Dept 1910]; People v Carroll, 3 NY2d 686 [1958]); factors not present here. Moreover, in statutory construction, words of common usage are to be given their ordinary meaning unless it is plain from the statute that a different meaning is intended or that the statute evinces an intent that a special or technical meaning is to be attached to such word. In that case and only that case is the statute to be construed with such special or technical meaning. (Statutes §§ 232, 233; Matter of Manhattan Pizza Hut v New York State Human Rights Appeal Bd., 51 NY2d 506 [1980]; Matter of D’Elia v Douglas B., 138 Misc 2d 370 [1988].)
Here, no such considerations are present. Indeed, the extent to which the County Executive and the Budget Director misconstrued the exact import of the Legislature’s November *298 14th amendments appears to be more a function of the extent to which their interbranch relationship and communication had deteriorated rather than any lack of demonstrable legislative intent. Moreover, to the extent that section 4.07 directs that a particular methodology be employed, substantial, not literal, compliance is all that is required. Indeed, although not rising to the level of a finding, the County Executive’s purported basis for his veto, particularly when viewed in the context of his concerted effort to close Valley View without the advance approval (or the apparent knowledge) of the Legislature suggests that the basis for the veto was in part pretextual.
Notably, the County Executive does not allege (nor does the record support such a finding) that the Legislature, through the use of its purported inflated revenues and unrealistic and imaginary savings, was consciously attempting to circumvent the 2% statutory tax cap, in violation of its statutory or constitutional mandate (see e.g. Korn v Gulotta, 72 NY2d 363 [1988]; Wein v Carey, 41 NY2d 498 [1977]); an allegation which may have served as an alternative basis for his refusal to enforce the Legislature’s budget and a sufficient predicate for the court’s invasion into, and a more detailed scrutiny of, the budgetary process, an area typically reserved for the exclusive domain of the executive and legislative branches.
Suffice to say, the budget amendments effectuated by the Legislature in Resolution No. 272 were clear and unambiguous and under the 2% state tax cap and the Legislature’s override of the County Executive’s veto proper. The 2013 county budget, as amended by the Legislature, was therefore properly adopted and constitutes the county budget for 2013; a budget that the County Executive is duty bound, by the Charter and state law, to follow and implement.
Having concluded such to be the case, the County Executive’s December 18, 2012 declaration, concluding that the Legislature’s override vote was “unlawful” and “null and void,” must itself be declared a nullity. Such declaration, coupled with his refusal to implement the Legislature’s 2013 budget, constituted an ultra vires act, in excess of his executive powers, and was contrary to the budget procedure itself. (See e.g. Rapp v Carey, 44 NY2d 157 [1978]; Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo, 64 NY2d 233, [1984].)
*299 The County Executive’s Authority to Close Valley View
Having concluded that the Legislature’s override and its budget amendments were proper, the court now turns to the second interbranch dispute which concerns the continued operational status of Valley View. At the core of this interbranch dispute are the powers which each party asserts have been bestowed and/or reserved to it or them, i.e., the County Executive and the Orange County Legislature, respectively, by the County Charter itself; a Charter which, by its terms, is broadly crafted and expansive in its terms. Moreover, in deciding the depth and breadth of the powers conferred upon each, the case at bar appears to be one of first impression. Notably, although each side has offered legal authority in support of its respective positions, and prior instances which each believes manifest the manner in which their powers have been historically exercised, no legal precedent has been offered which is directly on point. Nor has this court’s research revealed the same. Here, as with the issue of the Legislature’s budgetary amendments and the validity of their override, it is substance not form that is controlling.
The concept of separation of powers has long since been determined to be the foundational cornerstone for our system of government at all levels. Relevant to the case at bar, where the County Executive asserts as a financial imperative the necessity for closing Valley View, the observations made by the Court of Appeals in Matter of Maron v Silver (14 NY3d 230 [2010]) appear particularly relevant. In Maron, the Court of Appeals stated the following:
“The concept of the separation of powers is the bedrock of the system of government adopted by this State in establishing three coordinate and coequal branches of government, each charged with performing particular functions. The Constitution’s aim ‘is to regulate, define and limit the powers of government by assigning to the executive, legislative and judicial branches distinct and independent powers,’ thereby ensuring ‘an even balance of power [among] the three.’ . . . [i]t is a fundamental principle of the organic law that each department should be free from interference, in the discharge of its particular duties, by either of the others.” (Id. at 258, citing Matter of County of Oneida v Berle, 49 NY2d 515, 522 [1980] [internal quotation marks and citations omitted].)

“It must be remembered that the Separation of Bow
*300
ers Doctrine

“ ‘is a structural safeguard rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified. In its major features ... it is a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict.’ ” (Maron at 260-261, citing Plaut v Spendthrift Farm, Inc., 514 US 211, 239 [1995] [emphasis supplied].)
Further, and as the Court of Appeals stated in Under 21, Catholic Home Bur. for Dependent Children v City of New York (65 NY2d 344, 356 [1985]), “[w]hile the doctrine of separation of powers does not require . . . three airtight departments of government, it does require that no one branch be allowed to arrogate unto itself powers residing entirely in another branch.” (Internal quotation marks and citations omitted.)
Thus, as the Court of Appeals has reasoned, it cannot be, as the County Executive suggests, that the financial imperative for Valley View’s closure, although compelling in its presentation, is what drives the determination of whether the County Executive is vested with the requisite authority under the Charter to unilaterally, and in contravention of the County Legislature’s stated policy and funding, close Valley View. The County Executive’s powers must be derived from the Charter itself, those specifically enumerated or necessarily implied; a determination that can only be made by the interpretation and construction of the Charter itself.
In that regard, and in addition to the interpretive principle referenced, supra, it is well settled that the primary consideration of the courts in the construction of a statute is to ascertain and give effect to the legislative intent as expressed in the statute and that in ascertaining that intent the statutory language so utilized is to be construed in accordance with its ordinary and natural meaning without resort to artificial or forced construction. (See Statutes §§ 76, 92, 94; see also ShorehamWading Riv. Cent. School Dist. v Town of Brookhaven, 107 AD2d 219 [2d Dept 1985]; Regan v Heimbach, 91 AD2d 71 [3d Dept 1983].) And, while it is true that statutes are to be strictly construed, it is equally true that in determining legislative intent, statutory provisions are to be construed in such a manner so as to avoid conflict and to preserve the intent of the legislature. In short, it is the duty of the court to read and *301 construe all parts of a statute as a whole and, where possible, harmonize the provisions and endeavor to give effect to every word contained in the statute or legislative act. (See Statutes §§ 97, 98; Carney v Philippone, 1 NY3d 333 [2004]; Matter of Yolanda D., 88 NY2d 790 [1996].)
Moreover, in ascertaining such legislative intent, the court cannot, in discharging its interpretative function and by implication, supply a provision which it is reasonable to suppose that the legislature intended to intentionally omit; and the failure of the legislature to include such matter within the scope of an act may, by its omission, be construed as an indication that its exclusion was intentional. (See Statutes §§ 74, 240; see also Pajak v Pajak, 56 NY2d 394 [1982]; Bay Shore Family Partners v Foundation of Jewish Philanthropies of Jewish Fedn. of Greater Fort Lauderdale, 239 AD2d 373 [2d Dept 1997]; City of New York v New York Tel. Co., 108 AD2d 372 [1st Dept 1985].)
Here, the County Executive relies predominately, if not exclusively, on the power and authority conferred upon him, inter alia, to “supervise, direct and control and administer all departments” (Charter § 3.02 [e]), his power and authority to “supervise and direct the internal structure and organization of every unit of the executive branch of the County government, including . . . the appointment and dismissal of employees” (Charter § 3.02 [h]) as well as “all the powers . . . duties . . . conferred or imposed upon him by local law” (Charter § 3.02 [s] [emphasis supplied]).
As a further means of buttressing his argument, he relies upon the fiduciary duty which he owes to the taxpayers of the County, the discharge of which, he argues, necessitates the elimination of any further drain on the county treasury posed by Valley View’s continued losses, and its resulting depletion of the county surplus and fund balance; a reserve fund, he asserts, which is necessary in order to ensure current and prospective real property tax stability and preserve the County’s triple-A bond rating.
The County Executive further relies, inter alia, on the holdings in Matter of Caputo v Halpin (78 NY2d 117 [1991]), which upheld the power of the Suffolk County Executive to unilaterally institute a hiring freeze. Indeed there are similar rulings emanating from the Second Department sustaining the County Executive’s authority in effectuating remedial action of comparable magnitude. (See e.g. Matter of Dutchess County Legislature v Steinhaus, 56 AD3d 469 [2d Dept 2008].) Respondents further *302 rely on the case of CSEA, Inc. v Orange County (Sup Ct, Orange County, index No. 934/2011), in which the union challenged, but the court sustained, the County Executive’s authority to lay off 39 Valley View employees; arguing that only the Legislature had the authority to lay the employees off. None of the cases cited, supra, however, provide the necessary legal predicate to support the magnitude of what the County Executive seeks to do in this instance, which is to, de facto, dismantle and abolish an entire county department or unit without the Legislature’s approval, where the power to do so is squarely reposed.
First, the County’s reliance on the 2011 CSEA ruling, and its purported binding effect, is misplaced in at least two respects: (1) the County Executive’s own submissions confirm that the 39 layoffs were the final piece in effectuating the Berger Commission’s recommendations, which had the “force of law,” but which nevertheless left Valley View and the Department of Residential Health Care Services (Charter art XXIII) intact; and (2) the County, at least implicitly, is suggesting that the decision has some type of collateral estoppel effect which is somehow binding on the Legislature, which is not the case since neither of the required conditions for collateral estoppel are present, i.e., the identity of legal issues presented and the opportunity for a full and fair opportunity to contest the same. (See Jeffreys v Griffin, 1 NY3d 34 [2003]; Mavco Realty Corp. v M. Slayton Real Estate, Inc., 77 AD3d 892 [2d Dept 2010].)
Respondent further cites his unilateral closure of the Government Center, after Hurricane Irene, as further evidence of the executive powers which he possesses. However, that closure was done so under the auspices of his authority to “declare the existence of emergencies affecting the life, health or safety” and his authority to “exercise all the powers and duties necessary for the protection thereof’ (see Charter § 3.02 [q]), not his authority to supervise, direct and control and administer all departments.
It is the Charter language itself, coupled with the current composition of the Department of Residential Health Care Services, however, which poses the biggest impediment to the County Executive’s argument; a Residential Health Care Services Department which consists and is comprised of only one residential health care facility, Valley View. While the County Executive has the power and authority to supervise, direct and control and administer all departments (§ 3.02 [e]) and supervise and direct the internal structure of every unit (§ 3.02 [h]), only *303 the Legislature as the legislative, appropriating and policy determining body of the County has the power to create, alter, combine or abolish county administrative units not headed by elective officials (§2.02 [f]) and establish or abolish positions of employment and titles thereof. (§ 2.02 [1].) Notably, and conspicuously absent from the enumeration of the County Executive’s powers under subdivision (e), is the County Executive’s ability to create, alter, combine or abolish the very same departments he is charged with supervising, directing, controlling and administering; an omission which, in this court’s view, is significant in reconciling and harmonizing (as the court must) the two provisions and in ascertaining their intended import.
The record is clear, as the County Executive readily admits, that the Department of Residential Health Care Services’ sole function, at this juncture, is to administer and oversee Valley View. Indeed, on inquiry from the court, the County Attorney conceded, albeit reluctantly, that Valley View Administrator La-Due would have “nothing to do” if Valley View were closed, nevertheless arguing that such closure would not prevent the County from altering or re-crafting the Department in the future. This too would seem to be problematic from the County Executive’s standpoint, since the ultimate approval for same would presumptively, and ultimately, require prospective legislative approval. (§2.02 [f].)
While the Charter seems to draw distinctions in its definitions of what constitutes a “department” (§ 1.01 [j]), “division” (§ 1.01 [1]), or “unit” (§ 1.01 [x]), such distinctions are meaningless, and irrelevant, to the issues at bar. Here, it is clear that as the County’s sole residential health care facility, if Valley View closes, the Department of Residential Health Care Services, in its present form, will cease to exist and Administrator LaDue will have “nothing to do.”
Suffice to say, and on these facts, what the County Executive seeks to do within the confines of the 2013 budget (i.e., to unilaterally close Valley View without the Orange County Legislature’s approval where the power to do so is clearly reposed), constitutes an impermissible violation of the doctrine of separation of powers. And, this is true regardless of whether the County Executive attempts to “legislate” by action or by inaction, by an unauthorized executive order or his failure to enforce a clearly articulated policy of the legislature. (See Matter of Council of City of N.Y. v Bloomberg, 6 NY3d 380 [2006]; Under 21, Catholic Home Bur. for Dependent Children v City of *304 New York, 65 NY2d 344 [1985]; Rapp v Carey, 44 NY2d 157 [1978].)
“Where [substantive and] . . . policy matters have demonstrably and textually been committed to a coordinate, political branch of government, any consideration of such matters by a branch or body other than that in which the power expressly is reposed would, absent extraordinary or emergency circumstances, constitute an ultra vires act.” (Matter of New York State Inspection, Sec. & Law Enforcement Empls., Dist. Council 82, AFSCME, AFL-CIO v Cuomo, 64 NY2d 233, 240 [1984] [citation omitted].)
Having determined that the County Executives’s unilateral closure of Valley View, without the Legislature’s approval, is in excess of his statutory powers as conferred by the Charter and would thus constitute an ultra vires act, the court is nevertheless compelled to address, in considerably more depth, the financial necessity or financial imperative which the County Executive asserts as the ostensible basis for the closure of Valley View, from two distinct vantage points: (1) his well intentioned motive, in discharging his fiduciary duty, to ensure the County’s fiscal soundness and the stability of its tax rate; and (2) the palpable (as alleged by the County Executive and the Budget Director), insufficiency and unrealistic nature of the Legislature’s revenue and expense projections. Neither consideration, however, serves as a sufficient predicate to permit the County Executive to usurp the Legislature’s powers nor the necessity for this court’s intrusion into the budget process itself or for this court to pass on the wisdom of the Legislature’s budget, its budgetary assumptions, or its perceived priorities.
First, it is well settled that no matter how well intentioned an executive’s intentions may be, he may not unlawfully infringe upon the powers reserved to the legislative branch (Council of City of N.Y.v Bloomberg at 398, 399) and “[w]hen the executive acts inconsistently with the legislature or usurps its exclusive powers, the doctrine of separation of powers is violated.” (Id. at 403; Rapp v Carey, 44 NY2d 157 [1978].)
Here, the County Executive has laid out, in significant detail and compelling fashion, the extent to which Valley View has historically been subsidized, the projected shortfall for budget year 2013 and the anticipated drain on the County’s fund balance and financial reserves; the financial reality of which, he as *305 serts, will negatively impact on the County’s bond rating, will cause the tax levy to skyrocket, and negatively impact on the County’s prospective ability to maintain its services and current priorities. In short, he argues, affirmative action on his part is an imperative if he is expected to fulfill his fiduciary obligation to the County and its citizens.
However, the concept of a fiduciary relationship is considerably broader than the County Executive suggests. While it includes financial stewardship and responsibility, it is not limited to it. In its broader context, a fiduciary relationship is deemed to exist when one party is under a duty to act for the benefit of others; it is a relationship in which one party reposes special confidence and trust in another and reasonably relies on such party to act in his or her best interest. (See e.g. Barrett v Freifeld, 64 AD3d 736 [2d Dept 2009]; Eurycleia Partners, LP v Seward & Kissel, LLP, 12 NY3d 553 [2009]; AG Capital Funding Partners, L.P. v State St. Bank & Trust Co., 11 NY3d 146 [2008].)
How broad that fiduciary relationship extends, however, is a question of policy and the Legislature, pursuant to the Charter, is the policy making body of the County. Indeed, both the County Executive and the Legislature readily concede that Valley View is losing money. Where they differ is in the magnitude of the losses being sustained, the reason for the losses, and the significance of the losses as it relates to their role as representatives of the county citizenry and indeed the role of county government. At the core of the policy dispute is whether the County should even be in the nursing home business. Indeed, the legislative minutes are replete with references from legislators expressing the viewpoint that all county departments lose money; they are created to provide services not make money. Such policy considerations, for example, drive not only funding for Valley View to ensure care for the County’s senior and elderly population, but its commitment to higher education and its funding of the County’s community college. To the extent those policies are realized, however, is, in part, dependent on the budgetary process itself and the ability of the executive or legislative branches, through the County’s system of checks and balances (i.e., budget amendments, veto and override) to impose his or its will. That is how our system of government works and that is what the County Charter contemplates and provides for.
Having now determined that the Legislature properly voted to override the County Executive’s veto and adopt the 2013 *306 budget, the court may not, except in very limited and well defined circumstances not present here, intrude on the budgetary process itself nor on the wisdom of what the Legislature chose to adopt. Nor may this serve as a basis for the County Executive to unilaterally declare the budget “null and void.”
In so concluding, the court begins its analysis with the well established principle that a budget is merely a statement of the financial position of a governmental unit, for a period of limited duration, based upon proposed expenditures and anticipated revenues. (Matter of Korn v Gulotta, 72 NY2d 363 [1988]; Matter of Collins v City of Schenectady, 256 App Div 389, 391 [3d Dept 1939].) In the City of Beacon v County of Dutchess (285 App Div 1050 [2d Dept 1955]), the Second Department recognized that the preparation of a budget is largely a process that involves the exercise of the discretionary function of budget officials (executive and legislative) in estimating revenues and expenses. In so recognizing, it held that, in the absence of express statutory authority to the contrary, courts do not have the power to review the exercise of those discretionary powers regarding the estimates of money the municipality reasonably believes will be necessary to carry on the municipality’s affairs. Thus, the courts do not invade the budgetary process which is the exclusive domain of the executive and legislative branches. (Saxton v Carey, 44 NY2d 545 [1978]; Wein v Carey, 41 NY2d 498 [1977].) “Judicial restraint [on budgetary considerations] reflects a recognition that there are ‘questions of broad legislative and administrative policy [that go] beyond the scope of judicial correction.’ ” (Matter of Korn v Gulotta, 72 NY2d at 376, quoting Jones v Beame, 45 NY2d 402 [1978].) Such restraint is further reflective of the recognition that “questions of judgment, discretion, allocation of resources and priorities [are] inappropriate for resolution in the judicial arena [and are better left to the] network of executive officials, administrative agencies and local legislative bodies.” (Matter of Abrams v New York City Tr. Auth., 39 NY2d 990, 992 [1976] [emphasis supplied]; see also Matter of Lorie C., 49 NY2d 161 [1980].)
Here, through its debate, its funding resolutions, and its override, the Legislature has spoken loud and clear that its stated policy is, at least within the confines of the 2013 county budget, that Valley View is to remain open (see e.g. Matter of Citizens For An Orderly Energy Policy v Cuomo, 78 NY2d 398 [1991]) and the County Executive must live with that clearly articulated policy, at least in this court’s view. Although it may well be *307 stated, as the County Executive argues, that if the County Legislature continues to pursue its present policy of funding Valley View and underwriting its continued losses in the current health care environment with the anticipated decrease in federal and state reimbursement, that the County’s bond rating will suffer, future capital projects will become more expensive, that the County’s reserve fund will become depleted or eliminated, that taxes will skyrocket, priorities skewed, and that essential services will be impaired; the wisdom of the Legislature’s decision, and derivatively their longevity, is for the electorate to decide, not the courts.
The Declaratory Relief
In fashioning the declaratory relief which the parties seek, the parties are again reminded that the purpose of a declaratory judgment is to stabilize the legal relations of the parties through the establishment and promulgation of the rights of the parties on a particular subject matter. Its purpose is to declare what the present and prospective rights of the parties are. Thus, to the extent the parties have requested declaratory relief, with respect to the adoption of 2013 county budget, such relief is granted to the extent hereinafter declared and the rights and legal relations of the parties are as follows:
1. That, the budget amendments effectuated by the Orange County Legislature, and as codified in Resolution No. 272, were done so in conformity with, and in the manner prescribed by, section 4.07 (a) and that the amendments so effectuated were under the 2% statutory tax cap thereby obviating the necessity for the adoption of a companion local law.
2. That, the clear and unambiguous intent of Resolution No. 272, as memorialized in the schedule denoted “Legislative Adjustments Schedule B,” was to retain the tax levy figure originally proposed by the County Executive and to incorporate the same in its revenue projections for the purpose of funding Valley View’s operations for the entirety of budget year 2013.
3. That, the Orange County Legislature’s override vote of December 12, 2012 (Resolution No. 328) adopted by a supermajority of 19 to 2 constituted valid legislative action, in conformity with the Orange County Charter, and was binding upon the County Executive.
4. That, by reason of the foregoing, the 2013 Orange County budget, as amended and adopted by the Orange County Legislature, constitutes the lawful Orange County operating *308 budget for 2013, and that such budget is enforceable by the Legislature, and binding upon respondents County Executive and the Budget Director, in accordance with its terms.
5. That, by reason of the foregoing, the respondents, to wit: the County Executive of Orange County and the Budget Director of Orange County, are duty bound to follow and properly implement such budget, as amended, in the manner, and within the discretionary powers, conferred upon them by the Orange County Charter.
6. That, by reason of the foregoing, the County Executive’s letter of December 18, 2012 declaring the aforesaid actions of the Orange County Legislature, inter alia, “unlawful” and “null and void,” is itself declared null and void ab initio and of no legal effect.
7. That, by reason of the foregoing, the failure of the County Executive and the Budget Director, or either of them, to follow and properly implement the 2013 Orange County budget, as amended, constitutes an ultra vires act, in derogation, and in excess, of his or their executive powers as conferred by, and enumerated in, the Orange County Charter. The petitioner is therefore entitled to the CPLR article 78 relief which it seeks in the nature of mandamus directing the County Executive and the Budget Director to follow and properly implement the 2013 Orange County budget.
8. That, as the legislative, appropriating and policy determining body of the County, and pursuant to Charter § 2.02 (f), the power and authority to create, alter or abolish any and all administrative units not headed by elected officials is vested solely in the Orange County Legislature and not the County Executive.
9. That, by reason of the foregoing and the reasons hereinbefore cited, including, inter alia, the current structure of the Department of Residential Health Care Services (Charter art XXIII), the unilateral action of the County Executive, which seeks the closure of the Valley View Center for Nursing Care and Rehabilitation, without the consent and approval of the Orange County Legislature, constitutes an impermissible exercise of the powers conferred upon the County Executive under the County Charter, a usurpation of the powers conferred upon the Legislature and, thus, a violation of the doctrine of separation of powers.
10. That by reason of the foregoing, and the court’s finding that the petitioner has, inter alia, established its success on the *309 merits, irreparable harm and a balancing of the equities in its favor, the petitioner is entitled to the injunctive relief which seeks, insofar as hereinafter ordered.
Orders and Court Directives
That in conformity with the foregoing decision, and in addition to the declaratory relief hereinbefore enumerated, it is ordered, that the cross motion of the respondents, which seeks, inter alia, summary judgment, pursuant to CPLR 3212, and dismissal of the petition is denied and their answer is hereby dismissed; and it is further ordered, that consistent with the foregoing, the court, sua sponte, grants to petitioner summary judgment; and it is further ordered, that consistent with the foregoing, the petition of the Orange County Legislature, insofar as it seeks article 78 relief in the nature of mandamus, is granted to the extent hereinafter set forth; and it is further ordered, that in accordance with, and for the purpose of effectuating the foregoing, the respondents, and each of them, and all officers, agents and employees operating by or under his or their direction, are hereby directed to, and shall, forthwith, follow and properly implement, or cause to be followed and properly implemented, the 2013 Orange County budget as approved by Resolution No. 331 of 2012, as amended by Resolution No. 338 of 2012; and it is further ordered, that the respondents, their officers, agents, employees, or any persons, firms or legal entities acting by, under or through them, are hereby, and shall be, enjoined, restrained and prohibited from closing Valley View Center for Nursing Care and Rehabilitation or from taking, or causing to taken, any action, direct or indirect, to implement the closure plan referenced in the Department of Health approval letter of January 28, 2013, during Orange County fiscal year 2013 or unless or until superseded by further order of the court.

. NY Constitution, article IX, § 1 (h) (1) provides in relevant part that “[c]ounties, other than those wholly included within a city, shall be empowered by general law, or by special law enacted upon county request pursuant to section two of this article, to adopt, amend or repeal alternative forms of county government provided by the legislature or to prepare, adopt, amend or repeal alternative forms of their own.”
Article IX, § 2 (b), further provides that
“[s]ubject to the bill of rights of local governments and other applicable provisions of this constitution, the legislature: . . .
“(3) Shall have the power to confer on local governments powers not relating to their property, affairs or government including but not limited to those of local legislation and administration, in addition to those otherwise granted by or pursuant to this article, and to withdraw or restrict such additional powers.”
The County Charter Law (Municipal Home Rule Law art 4, part 1) provides for the adoption of a charter as an alternative form of government to that set forth in the County Law. Section 33 (2) of the County Charter Law further provides, in relevant part, that “[a] county charter shall set forth the structure of the county government and the manner in which it is to function.”
In conformity with such constitutional and statutory authorization, and pursuant to the enactment of Local Law No. 8 of 1968, Orange County established a charter form of government. The Orange County Administrative Code was thereafter adopted by Local Law No. 10 of 1969. Pursuant to County Charter Law § 33 (4) (d), the Administrative Code is required to set forth the details of administration of the county government in harmony with the provisions of the County Charter. Under the County Charter, all of the powers and duties of county government are enumerated in, or delegated to, either the legislature or the executive.

. General Municipal Law § 3-c, enacted by chapter 97 of the Laws of 2011, was adopted by the legislature to effectuate the twofold purpose of establishing limitations on the ability of school districts and local government to increase its or their tax levies and fiscal transparency if they do. General Municipal Law § 3-c (1) substantively provides that the amount of real property taxes that may be levied by or on behalf of any local government, other than the City of New York and the counties contained therein, shall not exceed the tax levy limit established pursuant to subdivision (2) which, by its terms, limits the “allowable levy growth factor” to not more than 2% or the rate of inflation, whichever is less.
Local governments may nevertheless increase their property tax levy by more than the statutory 2% level or rate of inflation by adopting a local law by a vote of 60% of the total voting power of the legislative body that enacted the levy in excess of the statutory cap. (See General Municipal Law § 3-c [5].)

. In outlining the “2013 Budget Highlights,” the County Executive again underscored that the gross proposed budget for 2013 totaled approximately $715.9 million as compared to $712.9 million for 2012, an increase of .4%, further estimating that the real property tax rate would be established at approximately $3.55 per thousand. In commenting on the magnitude of the budget, the County Executive also noted that “appropriated surplus” of $39,914,700 would be utilized to balance the 2013 budget.
Also included in the 2013 Budget Highlights were two significant notations relating to the proposed status of Valley View. Under the section denoted “Valley View,” the County Executive stated the following:
“I am proposing that Valley View be funded for one month in 2013. The gross amount budgeted for Valley View is $8,790,541 in 2013. There is $7,509,722 in County Taxation budgeted in 2013. Within the $7,509,722 in County Taxation, $5,445,588 relates to expenses that will remain in 2013 after closure. These items include: Retiree Hospital, debt service related items, and continuing obligations to the State/Federal governments.”
The County Executive also noted under the subheading “Positions,” the following:
“In 2013, I am proposing that 13 positions be eliminated from the budget. In addition, I am proposing effective January 31, 2013 that 425 positions be de-funded at Valley View. As a result, there are 2144 positions budgeted in 2013 compared to 2582 in 2012. This is a reduction of 438 positions or 17%.” (Emphasis supplied.)

. Resolution No. 272 included three attachments or schedules, schedules referenced as schedules A, B and C. Neither schedule A nor C is in issue. At issue are the “Legislative Adjustments” contained in schedule B; legislative adjustments ostensibly designed to fund Valley View’s operations for the entire fiscal year, i.e., all of budget year 2013.
At issue is the magnitude of the real property tax levy attributable to Valley View’s overall revenue stream for 2013. Real property taxes were denoted *287 under Budget Code No. 410011. In projecting its overall revenues for Valley View, the County Legislature included, inter alia, $4,309,722, to be derived from the county tax levy. Utilizing the same Budget Code (No. 410011), the Legislature also allocated $3.2 million earmarked for application to medical assistance, the ostensible purpose of which was to generate matching funds for intergovernmental transfers (IGT); a figure included in its revenue projections as $6 million. Notably, the sum total of the two budget lines, under Budget Code No. 410011, equates to the identical figure proposed by the County Executive, to wit: $7,509,722.

. In amplifying on his veto message, the County Executive underscored five key points: (1) that the resolution imposed an increase of 14.13% to the County’s tax rate and an increase of 8.55% to the county tax levy; (2) that the resolution’s (Resolution No. 272) schedule B included $6.0 million in IGT funds that do not yet exist and may never be realized; (3) that the resolution’s schedule B included $38,557,242 in nursing home revenues that were specula *288 tive and hypothetical; (4) that the resolution’s schedule B expenses, as presented, relied upon unrealized givebacks and concessions by the CSEA; and (5) that schedule B of the resolution did not responsibly address the continued operation or maintenance of the facility for 12 months in 2013.
The County Executive’s veto message ultimately concluded by referencing the severe financial consequences that the Legislature’s budget would ultimately have on the County’s financial stability, specifically referencing Moody’s Investor Service’s warning that the inability to absorb unanticipated costs related to delays with the nursing home would result in a significant drain on the County’s reserves, potentially resulting in a diminishment of the County’s triple-A bond rating. In concluding, the County Executive stated the following: “These are not risks that I am willing to take. They are not good for the future financial health and well-being of our County.”

. Notably Deputy Commissioner Westerfelt’s letter of January 28, 2013, authorizing and approving the County’s closure plan, did not mandate Valley View’s closure. It only concluded that the County’s plan, as submitted, met its (DOH’s) criteria for closure; a distinction that, in this court’s view, is of particular significance in light of the laborious detail in which the County recounted the import of the Berger Commission’s findings and recommendations, findings and recommendations which, as of January 1, 2007, had the force of law. In contrast to ordering Valley View’s closure, the Commission had previously recommended only that it (Valley View) “downsize by approximately 160 nursing home beds and add assisted living, adult day care and possibly other non-institutional services ... [in addition to] . . . converting 50 nursing home beds to ventilator-dependent and behavioral step-down units”; recommendations which strongly suggest that rather than closing the facility it was recommending modifications to the services Valley View provided in order to enhance service delivery to Orange County’s changing demographics and to more effectively serve its senior population.
It is unclear, from the record, what the actual content of the County’s submissions to the Department of Health consisted of or the ostensible basis it was asserting for Valley View’s closure to DOH. Nor is it clear from the record the extent to which, if at all, the County Executive received any prior legislative authorization to submit the plan, in the first instance. Although as noted, supra, the record, when read as a whole, suggests that the proposal for closure, although apparently submitted in October of 2012, was never autho *290 rized or approved by the Legislature in advance. Indeed the record strongly suggests that the Legislature was not even aware that the closure plan was being submitted.
On the record presented, it appears that the first formal written communication from the County Executive’s office to the Legislature, regarding Valley View’s closure, did not occur until the County Executive authored and transmitted his letter of February 15, 2013 to Orange County Legislative Chairman Pillmeier; the content of which was couched, by the County Executive, as a “report and recommendation to the Legislature on the budget deficit at Valley View and the remedial action (which he) had taken pursuant to § 4.10 of the Orange County Charter.” County Executive Diana further stated that after “consultation with [the] Budget Director and Commissioner of Finance, [he] had concluded that even based upon the budget adopted by the Legislature, revenues [would] be insufficient to meet the amounts appropriated for Valley View in 2013.”

. The February 6, 2013 preliminary injunction referenced in the County’s submissions constituted a short form order issued by the court in conformity with, and based upon, the parties’ stipulation of adjournment.
By order to show cause dated January 15, 2013, the underlying proceeding was originally returnable before the court on January 30, 2013. Thereafter, *291 and by stipulation of adjournment entered into between the parties on January 22, 2013, and “So Ordered” by the court, the parties stipulated and agreed to adjourn the pending proceeding to February 6, 2013 conditioned upon the maintenance of the status quo, i.e., that no action would be taken by the County Executive to close Valley View. The stipulation in relevant part provided that “[Respondents and their employees and agents shall take no actions to close Valley View Nursing Home and shall maintain the status quo” until the return date of February 13, 2013.
Subsequent thereto, and on February 4, 2013, the parties again entered into a “Stipulation of Adjournment” stipulating and agreeing to adjourn the pending return date to March 6, 2013, a stipulation of adjournment so ordered by the court, in which the parties again agreed to maintain the status quo.
The February 6, 2013 short form order issued by the court was so issued in conformity with the aforementioned stipulations and, consistent with their general tenor and intent, issued for the sole purpose of maintaining the status quo pending decision of this court; not for the purpose of changing the burden of proof for the entitlement to injunctive relief.